## COMMONWEALTH *vs.* JAMES CONNORS.

Hampshire.  May 22, 1984. — June 22, 1984.

Present: GREANEY, C.J., ARMSTRONG, & WARNER, JJ.

*Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Consciousness of guilt.

Although the judge at the trial of indictments charging armed robbery and related offenses stated a number of times, without objection, in his instructions to the jury that the only issue in the case was the question of identification and that there appeared to be no dispute that the crimes had been committed, these statements considered in light of the instructions as a whole and in the context of the trial did not create a substantial risk of a miscarriage of justice. [287-290]

At the trial of indictments charging armed robbery and related offenses, the judge did not err in admitting evidence that the defendant had escaped from a house of correction as tending to show the defendant's consciousness of guilt, even though the escape took place some two months after the indictments were returned and about five months before the trial, while the defendant was serving a sentence for an unrelated burglary. [290-292]

Remarks made by the prosecutor in an armed robbery case, in which he stated what conclusions the jury should reach as to which witnesses had been lying, did not impermissibly vouch for the credibility of the Commonwealth's main witness and did not amount to an improper expression of personal opinion. [292-293]

INDICTMENTS found and returned in the Superior Court Department on April 5, 1982.

The case was tried before *Cross,* J.

*Charles Donelan* for the defendant.

*Charles K. Stephenson,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J.  The defendant, James Connors, was convicted by a jury on multiple indictments charging armed assault in a dwelling house, armed robbery while masked, confining,

burglary, and the unlawful possession of firearms. Sentences were imposed.[1] He contends that the convictions must be reversed because (1) the judge denied him a fair trial by referring in his jury charge to identification as the sole issue in the case; (2) evidence of his escape from a penal institution was improperly admitted in evidence; and (3) the prosecutor engaged in prejudicial final argument. We affirm the convictions.

In the early morning hours of June 14, 1981, three masked men, armed with pistols and a knife, broke into a house in South Hadley occupied by a husband and wife and their daughter. The husband and wife were tied hand and foot and forced at gunpoint to remain on their bed for the next two hours. One of the intruders awakened the daughter and held her at knifepoint. He threatened to kill her and forced her to disclose the mode of entry into a concealed room where her father kept his collection of antique firearms. The firearms were taken and loaded into several suitcases. Thereafter the robbers ransacked the house, took other valuables and fled by stealing the daughter's automobile. Since the robbers remained masked throughout the episode, none of the victims could identify them.[2]

Careful police investigation led to the arrest of Robert Carl Bennett, who admitted that he had participated in the robbery. Bennett implicated Stephen DeLong and the defendant as his confederates and identified the defendant as the robber who had assaulted the daughter. Testifying as the primary prosecu-

---

[1] A sentence of forty to fifty years to the Massachusetts Correctional Institution at Walpole was imposed on one armed robbery while masked indictment, like concurrent terms on the five remaining armed robbery and armed assault indictments, and concurrent sentences of nine to twelve years on the confining and burglary indictments. The remaining convictions on indictments charging the unlawful possession of firearms were filed with the defendant's consent and are not before us. See *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975).

[2] The daughter gave a description of the robber who held her at knifepoint. This description was confined to an estimate of his age, his height and build, and a description of his clothing. She also provided a very general description, limited to their approximate ages and builds, of the other two robbers.

tion witness at trial,[3] Bennett described the trio's activities before, during and after the robbery, and their unsuccessful efforts at fencing the firearms. Bennett's testimony was backed up by circumstantial evidence linking the defendant to the commission of the crimes.

The defendant did not contest the evidence establishing the commission of the crimes. He instead presented proof of alibi, essentially through the testimony of three witnesses. Stephen DeLong, the defendant's son, testified that he had participated in the crimes with Bennett, and that the third participant had not been his father, but rather a person named "Michael."[4] The defendant's wife testified that the defendant had been with her at his house in Waltham on June 13 and 14, 1981. Stephen DeLong's mother testified that Bennett had told her that the crimes had been committed by DeLong, one Michael Townsend and himself.[5]

1. On several occasions during his final instructions to the jury, the judge referred to the issue of identification as the "central," "sole," "main," or "whole" issue, at times putting the question for the jury in terms of whether they would be warranted in finding that the defendant was "one of the three involved in the . . . break-in." The judge also told the jury at one point in the instructions that "there seems to be no contention or dispute that there was the breaking in and armed robbery of the [victims'] house," and, at another point, that "there appears to be no question that an assault was committed." The defendant's trial counsel, whom the record discloses to be

---

[3] Bennett testified that, in exchange for his truthful testimony, he had agreed with the Commonwealth that he would enter guilty pleas to the indictments pending against him, that the Commonwealth would recommend sentences of three to five years' imprisonment at a correctional institution other than Walpole "[f]or [his] own protection," and that certain undisclosed considerations would be extended to his wife while he served his sentences.

[4] DeLong refused to divulge "Michael's" last name, although the name was known to him, claiming that he feared for his safety in prison.

[5] In rebuttal, the Commonwealth impeached this testimony by introducing records which tended to show that Townsend had been employed at a training school in Vermont, approximately 130 miles from the scene of the crimes, at critical times when the crimes had been planned and executed.

experienced, made no objection to the instructions.[6] The defendant argues that the case is governed by *Commonwealth* v. *Corcione,* 364 Mass. 611 (1974), because the charge reduced the case to a syllogism which required guilty findings on all the charges if the jury determined that the Commonwealth had met its burden of proof on the issue of identification.

Since there was no objection at trial, we focus our inquiry on whether any imperfections in the instructions created "a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). See *Commonwealth* v. *Wood,* 380 Mass. 545, 547 (1980). In seeking an answer to that question, we must examine the charge in its entirety and not upon isolated excerpts, see *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 278 (1982), and "against the background of the entire case," *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 314 (1973), giving some consideration to the fact that a timely objection might have enabled the judge to consider supplementation of his instructions to cure any possible error. See *Commonwealth* v. *Reid,* 384 Mass. 247, 258 (1981); Smith, Criminal Practice and Procedure § 1775 (2d ed. 1983).

We find no compelling analogy between this case and the *Corcione* decision. The error in *Corcione* arose from instructions which confronted a jury considering several indictments with "an all or nothing" situation by telling them that the case would permit only one of two results: either not guilty on all indictments, or guilty on all indictments (364 Mass. at 617-618). There was no similar instruction given here. Moreover, the judge told the jury, at least five different times, that they alone were the triers of fact and that they should not take anything said by him as any indication of how they should find the facts; he further advised them that they were the sole arbiters of the credibility of the witnesses; and he instructed them several times that they could not return a conviction on any offense unless they found that the essential elements of that offense had been established by the Commonwealth beyond a reasonable doubt, explaining the latter concept in language

[6] The defendant is represented by new counsel on appeal.

closely approximating the approved language in *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). The judge's instructions also have to be evaluated in the context of a trial in which the defendant chose not to controvert the Commonwealth's evidence proving the commission of the crimes and in light of defense counsel's closing argument to the jury in which he stated that the jury's function was "to determine if he [the defendant] was one of the three men that broke into the house and terrorized the [victims] . . . [t]hat is the only thing you have to decide and nothing else."[7] See *Commonwealth* v. *Holland,* 10 Mass. App. Ct. 845, 846 (1980).

We think the charge *permitted* the jury to believe the uncontroverted evidence describing the commission of the crimes, and allowed them, if they concluded that the Commonwealth had proved identification, to return convictions on the indictments. However, unlike the monolithic charge considered in the *Corcione* decision, the instructions here did not require the jury to reach a unitary verdict on all the indictments up and down the line. In particular, the clear and firm instructions, repeated several times, which advised the jury of their predominant role as factfinders, and which admonished them that they could not convict on any charge unless they had been persuaded that the Commonwealth had met its burden of proof, palliated any implications in the instructions that the elements of some of the crimes had been established and permitted the jury to exercise their independent judgment as to all the indictments.[8] See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 424-425

---

[7] As previously noted, the defendant concentrated on the issue of identification with independent proof of an alibi. The judge gave thorough and correct instructions on the evaluation of accomplice testimony to assist the jury in their consideration of the truthfulness of Bennett's testimony. The judge also instructed on the standards governing alibi evidence, emphasizing that the defendant had no burden to call any witnesses or produce any evidence.

[8] For these same reasons, the instructions differ materially from the instructions considered in *Commonwealth* v. *McDuffee,* 379 Mass. 353 (1979). In *McDuffee,* the judge improperly ruled and instructed the jury that the element of materiality in a perjury charge, as to which there had been disputed evidence, had been proved as matter of law. *Id.* at 365-366.

(1978). We conclude, without any special endorsement of the general suitability of the practice, that the charge, viewed as a whole, did not create a substantial risk of a miscarriage of justice.

2. The indictments were returned on April 5, 1982, and the trial commenced on December 8, 1982. On June 19, 1982, the defendant escaped from the Norfolk County house of correction where he was serving a sentence for an unrelated burglary. The fact of the escape was admitted over the defendant's objection as evidence of consciousness of guilt. The defendant argues that the escape, occurring approximately two months after the indictments were returned and approximately five months before the trial, provided marginally relevant evidence which could only have unfairly influenced the jury in reaching their verdicts.

It is the rule in Massachusetts that flight by one accused of a crime is evidence of consciousness of guilt and "probative of the defendant's guilty state of mind." *Commonwealth* v. *Booker,* 386 Mass. 466, 469 (1982). *Commonwealth* v. *Toney,* 385 Mass. 575, 583 (1982). "Whether evidence is relevant to prove an issue raised by the pleadings or an incidental material issue and whether the inflammatory nature of the evidence outweighs its probative value are matters for the discretion of the trial judge." *Commonwealth* v. *Sawyer,* 389 Mass. 686, 700 (1983). See *Commonwealth* v. *Booker, supra*; *Commonwealth* v. *Kelleher,* 14 Mass. App. Ct. 961, 962 (1982). The decision reached by the trial judge after balancing the competing considerations of relevance and prejudice will not be disturbed on appeal in the absence of "palpable error." *Commonwealth* v. *Sawyer, supra* at 700.

The lapse of approximately two months between the commission of the crimes and the escape, while greater than the time periods involved in other cases, does not require exclusion of the evidence. An incarcerated defendant, unlike a person at liberty, is not free to absent himself from his environs whenever he chooses. As a result, the exact timing of a prison break cannot become the dispositive factor in evaluating the relevance of flight. Such, in essence, is the teaching of *Commonwealth* v.

*Sawyer,* 389 Mass. at 700-702, where evidence of escape from prison shortly before the defendant's trial was scheduled to commence was held properly admitted even though the escape occurred several years after the commission of the underlying offense.[9] We think that the jury here could have inferred that the defendant's escape demonstrated consciousness of guilt.

Moreover, the possibility of unfair prejudice to the defendant was minimized in a number of ways. First, the prosecutor's questioning of the correctional official who testified about the escape was carefully limited to prevent the jury from learning that the defendant was serving a sentence for another crime at the time of his escape. Second, defense counsel, in his closing remarks, urged the jury not to accord any weight to the evidence of escape and suggested an alternative explanation for the defendant's flight. Third, the prosecutor, in his summation, made no reference to the evidence of flight. Fourth, and most importantly, the judge instructed the jury at some length that, should they believe the evidence of flight, they could, but need not, consider that fact as some evidence of guilt; that the evidence of flight was to be evaluated "in connection with all the other evidence in the case to determine whether . . . [it] portray[ed] a guilty conscience"; and that other explanations, unrelated to any consciousness of guilt, might well motivate an escape from prison.[10]

We can discern no "palpable error" in the judge's decision that the evidence of escape, if circumscribed to avoid mention

---

[9] The defendant's suggestion that the evidence was utterly without probative value because the escape occurred while he was serving a sentence on an unrelated offense is without merit. This factor would not control the admissibility of the evidence, but would be a factor for the judge to consider in exercising his discretion. See *Commonwealth* v. Booker, 386 Mass. at 469-471. See also *Commonwealth* v. *Geagan,* 339 Mass. 487, 512, cert. denied, 361 U.S. 895 (1959); *Commonwealth* v. *Sawyer,* 389 Mass. at 700-701.

[10] The instructions given by the judge generally conformed to the dictates of *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982). The defendant's trial counsel did not object to the judge's cautionary instructions on the evaluation of the evidence of flight. We note that the jury had before it a great deal of evidence, in addition to the evidence of flight, upon which it could have based its verdicts. This evidence included the testimony of

of the unrelated burglary and buffered by proper cautionary instructions, had probative value which was not outweighed by any resulting chance of prejudice.

3. The portions of the prosecutor's closing argument attacked as improper are set forth in the margin.[11] The defendant's trial counsel[12] made no objection at trial to these comments.

An examination of the prosecutor's entire closing argument discloses that he confined his remarks to the facts in evidence and to permissible inferences which the jury might draw from those facts. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 378 (1978). We think that the prosecutor, in the course of the closing, could permissibly offer "suggestions . . . as to what conclusions the jury should draw from the evidence" in deciding the credibility of important witnesses, *Commonwealth* v. *Fer-*

---

Bennett, who identified the defendant as one of his coventurers; the testimony of one Lisa Levis that she saw the defendant, accompanied by Bennett and Stephen DeLong, leave a motel in Chicopee together during the night of June 13, 1981, and return early the following morning; and testimony of one Kenneth Pitocelli identifying the defendant as one of the persons present in Bennett's apartment when Pitocelli negotiated the purchase of several of the stolen firearms.

[11]   "I suggest, ladies and gentlemen of the jury, if you use the testimony of the [victims] as your guide to determine what is true and what is not true, who lied to you and who told the truth, there can only be one answer:

"The man who told the truth is Robert [C]arl Bennett. He told you the truth about everything that happened in that house, and he told you the truth about who the third man was when he said it was that one, the one that is sitting over there, James Connors.

"He told you the truth, and Stephen DeLong lied. . . .

"Does that [the testimony of Stephen DeLong] make sense? Think about the fact that Stephen DeLong lied about each and every thing that he testified to, and if you consider the fact that he lied, you have the right to conclude that he lied about the bottom line, who the third man was. You have got the right to consider that. Consider the fact that he said, sure, I'd lie for my father, but I don't have to, and then he lied to you time after time after time. . . .

"I suggest to you that you can only reach one verdict on each and every indictment, and that that verdict is guilty."

[12] The portion of the prosecutor's closing argument which was objected to by the defendant's trial counsel has not been argued as improper on this appeal.

*reira,* 381 Mass. 306, 316 (1980), and that he could further suggest that the evidence warranted only guilty verdicts. See *Commonwealth* v. *Smith,* 387 Mass. 900, 906-907 (1983); *Commonwealth* v. *Gaeten,* 15 Mass. App. Ct. 524, 526-527 (1983), and cases cited. We do not read the challenged remarks as impermissibly vouching for the credibility of the Commonwealth's main witness. Nor do we perceive any improper expression of personal opinion in the argument. Viewing the remarks in the context of the prosecutor's entire argument, as well as in the light of the judge's instructions to the jury and the evidence at trial, see *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 416 (1978), we conclude that the prosecutor's summation stayed within acceptable limits.

*Judgments affirmed.*